IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

GREG BURROUGHS                                              PLAINTIFF

v.                                        CIVIL ACTION NO. 2:19-cv-48-TBM-MTP

CITY OF LAUREL, MISSISSIPPI;
MICHAEL REAVES, *in his individual capacity*
*as a City of Laurel Law Enforcement Officer*;
JOSH WELCH, *in his individual capacity*
*as a City of Laurel Law Enforcement Officer*            DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

In 2018, Greg Burroughs was acquitted of manslaughter relating to the death of his twenty-three-year-old girlfriend, Katherine Sinclair. Burroughs alleges that Defendants lacked probable cause (1) to detain him for 86 hours following Sinclair's fatal shooting and (2) to charge him in connection with her death several weeks later. Burroughs also claims that Defendants leaked information to the press about the investigation, intending to bias the grand jury against him, and conducted a flawed investigation that caused him to be wrongfully charged and indicted.

Burroughs has sued the City of Laurel and two of its police officers under 42 U.S.C. § 1983. Defendant police officer Josh Welch is entitled to qualified immunity on all Section 1983 claims against him. Defendant police officer Michael Reaves is entitled to qualified immunity on all Section 1983 claims against him—*except for* Burroughs' Fourth Amendment claim concerning a "prompt" judicial determination of probable cause to arrest. Officer Reaves is entitled to qualified immunity for the initial detention because he had arguable probable cause to arrest Burroughs on the night of the shooting. Reaves is not entitled to qualified immunity on the prompt judicial

1

determination claim because there is a question of fact as to whether the promptness requirement is satisfied. Burroughs was held for more than 48 hours (the Supreme Court's initial benchmark for promptness) without receiving access to a neutral judge, and the undisputed facts do not reveal an extraordinary circumstance or emergency to justify the delay. Concerning the other 1983 claims against the officers and the City, Burroughs cannot show that the Defendant police officers made false statements to the press about Burroughs or that they deliberately concealed exculpatory evidence or fabricated evidence.

Officer Welch and the City are entitled to judgment as a matter of law on all claims. Defendant Reaves is likewise entitled to judgment as a matter of law, save for one narrow claim: whether he is constitutionally liable for Burroughs' prolonged detention without a probable cause determination before a neutral magistrate.

## I.   FACTS & PROCEDURAL HISTORY

On the night of June 1, 2017, Katherine Sinclair suffered a fatal gunshot wound to the head while she was sitting in her car in Greg Burroughs' garage. At the time of the shooting, Burroughs was the only other person present. Burroughs did not immediately call the police. [103-5] pg. 81; [104] pg. 2. He first called his close friend, Kyle Robertson, who was Sinclair's uncle and who served as a municipal court judge in Laurel, Mississippi. [103-5] pg. 81; [104] pg. 2; [110-3] pgs. 391-92. When Robertson did not answer the phone initially, Burroughs called him a second time. [103-5] pgs. 83-84.

When Burroughs did eventually call 911, he reported that Sinclair shot herself, though he agrees that she "was seemingly happy earlier in the evening [prior to the shooting]." [110] pg. 5. The scene of the incident revealed Sinclair sitting in the driver's seat of her car in Burroughs'

garage—naked from the waist down and shoeless. [104] pg. 2. Burroughs told police that Sinclair's missing clothes were probably in his truck because she had taken them off while in his vehicle. [110-3] pgs. 711; 788-89. Police searched Burroughs' truck but did not find Sinclair's clothing. The next day, the police found her missing clothes in Burroughs' bedroom closet inside a shopping bag. [110-3] pg. 711. Her cell phone was also found inside Burroughs' home. Burroughs changed shirts prior to the police arriving, and it is undisputed that Burroughs initially did not disclose this fact to the police. [110] pg. 6.

After the shooting, Burroughs voluntarily accompanied law enforcement officials to the police station to give a statement. [16] pg. 4 ¶ 19. The police officers did not cuff him. The officers said he was not under arrest and would return home shortly. [16] pg. 4 ¶ 19. Burroughs was questioned at the station and agreed to take a polygraph. [16] pg. 4 ¶¶ 20, 22. Burroughs executed a "Polygraph Examination Agreement and Liability Release Form," which stated that Officer Welch would perform the examination, and that Burroughs "knowingly hereby absolve[s,] release[s], and hold[s] free from all liability whatsoever Josh Welch and/or the Laurel Police Department for taking the examination." [103-4]. Officer Welch had a polygraph certificate but did not have a polygraph license, and the polygraph machine was outdated. [110] pg. 16. According to Burroughs, "there is no dispute that [he] failed the polygraph examination on the night of the incident." [110] pg. 19.

After Officer Welch conducted the polygraph, which was within hours of the shooting, Officer Reaves interviewed Burroughs. Following the interview, Burroughs was cuffed and transported to jail. [110-3] pgs. 835-36. Burroughs was put in a cell in solitary confinement and subjected to "multiple strip searches." [16] pg. 4 ¶¶ 27-28, 32. Burroughs' confinement began in

the early morning hours of Friday, June 2, 2017 and ended on the afternoon of Monday, June 4, 2017. [110-3] pg. 714. This 86-hour confinement took place without an arrest warrant and without a criminal charge. [16] pg. 6 ¶ 33. Officer Reaves testified at the criminal trial that Burroughs was not arrested for murder but was held for "investigative detention."[1] [110-3] pg. 714. Within the first 48 hours of Burroughs' detainment, District Attorney Tony Buckley told police that they could continue to hold Burroughs while gathering information and executing search warrants for the house. [103-2] pg. 4. At the criminal trial, District Attorney Buckley explained that the "weekend allowed [Officer Reaves] to get search warrants done and go look through the house to see if any evidence of value could be recovered." [110-3] pg. 1025. When deposed, the District Attorney also indicated that he was concerned about destruction of evidence at one point because he learned that Burroughs' family was cleaning his house and garage. [103-2] pg. 5. After the family members were interviewed, District Attorney Buckley determined that they were only trying to be helpful in cleaning up and were not attempting to destroy evidence. [103-2] pg. 6. Burroughs was formally charged in connection with Sinclair's death several weeks after being released from custody. [16] pg. 7.

On June 2, 2017, the local newspaper, the *Laurel Leader-Call*, received word of the shooting. Mark Thornton, the editor of the paper, got a call from a "confidential source" about Sinclair's death. [110] pgs. 4-5. Thornton followed up with another source and proceeded to report on the investigation. [110] pgs. 4-5. For several months, this local paper published articles about

---

[1] At trial, Officer Reaves explained that the booking sheet indicated an arrest for murder because "you have to have something on the booking sheet for investigative detention. It's not a charge." [110-3] pg. 715. The transporting officer testified: "I transported [Burroughs to the jail] with the charge of murder that I was advised to." [110-3] pg. 116. That officer also testified "I didn't charge [Burroughs] with anything." [110-3] pg. 110.

the investigation, which included information not known to the public. Many of the details in the articles are undisputedly accurate, while some others are misleading.

Throughout the investigation leading up to Burroughs' grand jury indictment for manslaughter, some evidence arguably favored Burroughs' innocence, while other evidence could be viewed as favoring his guilt. For example, Burroughs says the body camera evidence proves the consistency of his statements to police, and that the 911 call indicates his emotional state. [16] pg. 4 ¶ 17. The Defendants say the video evidence reveals Burroughs' lack of emotion and "odd statements" made by him after the shooting (e.g., "Now I got to deal with this sh—t.").[2] [104] pg. 2. Defendants also assert that "Burroughs never inquired about Katherine Sinclair until late into the evening and then simply asked, 'Is she still breathing?'" [104] pg. 2. Burroughs admits that he did not ask about Sinclair immediately, and he does not dispute that he only asked whether she was still breathing. Instead, Burroughs clarifies that he asked the question after "only" twelve minutes of questioning. [110] pg. 4.

At least one police officer testified at the criminal trial that he noticed material on the gun that could indicate "blowback" evidence, which occurs when the barrel of the gun is in "close contact and the force of the gunshot, the energy released, will cause tissue . . . to explode almost." [110-3] pg. 212. This can cause tissue to get deposited either into the barrel of the gun or on the outside of the gun. [110-3] pg. 212. Evidence of blowback could indicate that the gun was shot close to Sinclair's head. [110] pg. 11 ¶¶ 20-21.

---

[2] Burroughs' summary judgment response brief asserts: "Mr. Burroughs' *father's* statement that 'Now, I've got to deal with this [sh—t]' is wholly immaterial regarding whether or not Mr. Burroughs pulled the trigger." [110] pg. 4 (emphasis added). However, the criminal trial transcript reveals that Burroughs made this statement to his father. [110-3] pg. 490-91. The undisputed video evidence shows that Burroughs said: "You know, living with the divorce -- living with the divorce and only getting my daughter half the time is hard. Now I got to deal with this sh—t." [110-3] pg. 467.

Officer Reaves took two latent fingerprint lifts from the gun's magazine and submitted them, along with the shell casing, to the Mississippi Crime Lab for review. [110-3] pgs. 589-590. He did not attempt to lift fingerprints from the exterior of the gun. [110] pg. 11 ¶¶ 20-21. Officer Reaves explained at the criminal trial that, based on his twenty-two years of experience, the exterior of the gun (the frame made of polymer dimple and the slide made of parkerized metal) was not conducive to fingerprinting. [110-3] pgs. 730-731. Reaves also sent the gun to the firearms examiner for ballistics testing, but he did not test for evidence of blowback. [110-3] pgs. 423; 895.

According to the medical examiner, Dr. Lisa Funte, Sinclair's manner of death was "undetermined," which meant there was insufficient information to classify her death as homicide, suicide, or accident. [110-3] pg. 208. Dr. Funte testified at trial that blowback evidence on the gun would not have changed her opinion as to the manner of Sinclair's death. [110-3] pg. 222.

The entrance wound was behind Sinclair's right ear, rather than at her temple. [104] pg. 2. The emergency room physician said the entrance wound was at an "awkward angle." [104] pg. 3. Based on the location of the wound, Sinclair could only have shot herself with her right hand. [104] pg. 3. Yet Sinclair was generally left-handed. Burroughs argues that Sinclair shot guns with her right hand. [16] pg. 6 ¶ 35. In contrast, Sinclair's "best friend" stated that Sinclair shot different guns using different hands. [86-6] pg. 1.

Within a few days after the shooting, one of Sinclair's friends showed the police a text message he had received from Sinclair on May 26 (a week before her death); the message from Sinclair said that Burroughs had threatened to kill her again. [110-3] pgs. 536-37; [103-1] pg. 2. It is

undisputed that the week before the shooting, Burroughs sent a text to Sinclair that said, "I could kill you" or "I would kill you." [103-1] pg. 3; [110] pg. 7.

Burroughs was indicted for manslaughter on or about October 26, 2017. The foreman of the grand jury testified via affidavit that "the Grand Jury was told that the polygraph test of Greg Burroughs was inadmissible and [it] was not considered by the Grand Jury in its decision to indict Mr. Burroughs." [103-3] pg. 1. The grand jury unanimously voted to indict based on evidence such as: "Burroughs' statements about the location of the car and [that] it was in gear when the shooting happened, the videos of the crime scene, Greg Burroughs' demeanor and interactions with individuals on the videos, [the] location of the wound, the angle of the bullet entry and exit wounds, and [the] lack of clothing on Ms. Sinclair." [103-3] pg. 1.

Before Burroughs' criminal trial, District Attorney Buckley agreed to a change of venue, acknowledging that "[Burroughs] could not receive a fair trial in Jones County." [110-11] pg. 3. Following a jury trial in Franklin County, Burroughs was acquitted. On April 2, 2019, Burroughs filed suit in this Court, pursuant to Section 1983, alleging claims concerning the criminal investigation and his prosecution.

On August 26, 2020, Burroughs deposed the editor-in-chief of the *Laurel Leader-Call*, Mark Thornton. Afterward, Burroughs filed a Motion to Compel Testimony, stating that Thornton refused to answer questions about his sources and that he "must be compelled to identify the sources he utilized in writing stories about the investigation which led to Mr. Burroughs's indictment." [86]. The Court ultimately denied Burroughs' Motion to Compel as untimely. [95].[3]

---

[3] Burroughs did not file the motion until August 31, 2020—*one* day before the *extended* discovery deadline expired. L. U. Civ. R. 7(b)(2)(C) (requiring parties to file discovery motions "sufficiently in advance of the discovery deadline" to allow time for a response and court order before the deadline expires). The record showed that Burroughs' counsel was aware as early as July 2, 2020 that Mark Thornton desired "to keep [his] sources confidential." [94-2] pg. 3. The

Officers Reaves and Welch were also deposed, and they each denied sharing any details of the investigation with the press. When Burroughs was deposed, he was asked, "Sitting here today, you have no idea who provided that information to the media?" [103-5] pg. 14. Burroughs replied, "I do not." [103-5] pg. 14.

## II.   STANDARD OF REVIEW

The qualified immunity standard "involves significant departures from the norms of civil litigation—particularly summary-judgment norms." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 328–29 (5th Cir. 2020). "Qualified immunity changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden." *Joseph on behalf of Est. of Joseph*, 981 F.3d at 329. When a plaintiff sues for a constitutional violation, he has "the ultimate burden to show that the defendant violated a constitutional right." *Id.* But when the qualified immunity defense is pled, the plaintiff has "the *additional* burden to show that the violated right was 'clearly established' at the time of the alleged violation." *Id.* (emphasis added).

"Under the ordinary summary-judgment standard," the defendant bears the initial burden of showing "no genuine dispute as to any material fact," and that the movant is entitled to judgment as a matter of law. *Id.* This means "showing that the record cannot support a win for the plaintiff—either because the plaintiff has a failure of proof on an essential element of its claim or because the defendant has insurmountable proof on its affirmative defense to that claim." *Id.* Then,

---

record also showed that Burroughs' counsel "understood" Thornton's position and even volunteered that the name of the source(s) "may not be material." [94-2] pg. 3. The Magistrate judge found that allowing the untimely motion to proceed would prejudice the proceedings by creating significant delay and increased costs. [95] pg. 4. The Magistrate Judge noted that the Court would have to start a new round of discovery potentially involving up to 10 sources or witnesses. [95] pg. 4. Accordingly, the Magistrate judge found that Burroughs' Motion to Compel was not timely filed. Burroughs filed objections, which the District Court Judge overruled, concluding that Burroughs had not demonstrated that the Magistrate judge's decision to decline "to effectively extend the discovery deadline a second time was clearly erroneous or contrary to law." [102] pg. 4. In December 2020, this case was reassigned from Senior District Judge Starrett to the undersigned.

if the defendant succeeds, the burden shifts to the plaintiff "to demonstrate that there *is* a genuine issue of material fact and that the evidence favoring the plaintiff permits a jury verdict in the plaintiff's favor.*" Id.* (emphasis in original).

In the qualified immunity context, the burden shifts differently from defendant to plaintiff. *Id.* at 329-30. Once the defendant makes "a good-faith assertion of qualified immunity," the summary judgment burden of proof shifts to the plaintiff, who "must show that the defense is not available." *Id.* "The plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury." *Id.* at 330. And

> to overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law. This requires the plaintiff to "identify a case"—usually, a "body of relevant case law"—in which "an officer acting under similar circumstances . . . was held to have violated the [Constitution]." While there need not be "a case directly on point," the unlawfulness of the challenged conduct must be "beyond debate." This leaves the "rare" possibility that, in an "obvious case," analogous case law "is not needed" because "the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances."

*Id.* (internal citations omitted).

In sum, "evaluating qualified immunity is a two-step process, and the burden is on the plaintiff to prove that a government official is not entitled to qualified immunity." *Wyatt v. Fletcher*, 718 F.3d 496, 502–03 (5th Cir. 2013). The first step is to "determine whether the plaintiff has alleged a violation of a clearly established constitutional or statutory right," and "the second step is to determine whether the defendant's conduct was objectively reasonable." *Id.* Of note, "[b]oth steps in the qualified immunity analysis are questions of law." *Id.*

### III.    QUALIFIED IMMUNITY ANALYSIS

#### A. Fourteenth Amendment "Stigma Plus Infringement" Claim

Burroughs claims that the Defendants are liable under 42 U.S.C.A. § 1983 for allegedly damaging statements published in the *Laurel Leader-Call*. More specifically, Burroughs says that City of Laurel officials anonymously leaked information to the media "to taint the jury pool and worsen [his] legal plight in violation of the Fourteenth Amendment." [110] pg. 13. There is no "constitutional doctrine converting every defamation by a public official into a deprivation of liberty." *Paul v. Davis*, 424 U.S. 693, 710-11, 96 S. Ct. 1155, 1161, 47 L. Ed. 2d 405 (1976). Yet, the Fifth Circuit does recognize a defamation-*like* claim under Section 1983 called "stigma plus infringement." *Does 1-7 v. Abbott*, 945 F.3d 307, 313 (5th Cir. 2019). The "stigma-plus" theory is founded on a two-prong test, which requires a claimant to "show stigma *plus* an infringement of some other interest." *Id.* (emphasis added).

The stigma prong requires "concrete, false factual assertions" from "the government about an individual." *Tebo v. Tebo*, 550 F.3d 492, 503 (5th Cir. 2008). The Fifth Circuit has explained that where "[t]here is no indication that [the stigmatizing] information came . . . from anyone [] connected to the government[,] [w]e find no basis to conclude that the publication element is met." *Tebo*, 550 F.3d at 504. The infringement prong requires that the state "sought to remove or significantly alter a life, liberty, or property interest recognized and protected by state law or the federal constitution as incorporated against the states." *Id.* at 503 (internal citations omitted).

Burroughs cannot identify a single "concrete, false factual assertion" made by either Officer Welch or Officer Reaves to a member of the press (or to anyone at all). Burroughs

repeatedly claims that the *Laurel Leader-Call* printed "half-truths" that are "whole lies." This assertion does not advance Burroughs' legal theory against the officers. [110] pg. 2. Anonymous information published in a newspaper does not equate to concrete, false factual assertions by the Defendants. As the First Circuit has noted in evaluating stigma-plus claims, where "there is no evidence that [] officials were responsible for spreading the information" and "[a]ny information spread . . . was the result apparently of unauthorized 'leaks,'" the state actor cannot not be held responsible for reputational damage. *Beitzell v. Jeffrey*, , 879 (1st Cir. 1981); *see Silva v. Worden*, 130 F.3d 26, 32–33 (1st Cir. 1997) (holding that a municipality "must also be responsible for the dissemination of defamatory charges, in a formal setting (and not merely as the result of unauthorized 'leaks'")); *Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 104 n.3 (1st Cir. 2002) ("Since [plaintiff] offers only speculation, rather than hard facts, we can only view these statements [in the newspaper] as non-actionable unauthorized leaks."). And Burroughs offers no caselaw to support a contrary conclusion.

Because the parties give considerable attention to Burroughs' polygraph exam when briefing the stigma-plus claim, the Court specifically addresses Burroughs' claim that Officer Welch allowed the polygraph results to be leaked to the media in "an apparent attempt" to damage Burroughs' reputation and "intentionally taint" the jury pool in Jones County. [16] pg. 10 ¶ 57. To substantiate this theory, Burroughs states that Officer Welch must have leaked the results of the failed polygraph because no one else initially knew about it. This speculative argument leads to two dead ends.

First, Burroughs undisputedly failed the polygraph. So even if the police officers did tell the press that Burroughs failed the polygraph exam, the assertion would not rise to the level of a

"concrete, false factual assertion." Second, there is simply no evidence in the record indicating that either Officer Welch or Officer Reaves leaked such information. Both officers denied doing so under oath, and they denied having knowledge of anyone who did. Additionally, the deposition testimony of District Attorney Buckley indicates that other people could have shared the information about Burroughs' polygraph conducted on June 1, 2017, which seems plausible given that the failed polygraph was reported in the *Laurel Leader-Call* nearly two months later, on July 28, 2017. [110] pg. 15 ¶ 42. According to the District Attorney, these other individuals include attorneys representing Burroughs, attorneys representing the Sinclair family, and members of Burroughs' family. [103-2] pg. 33-34. As the Defendants note, there is also the possibility that the information came from the District Attorney's office or from the District Attorney's investigator, who was on the scene the night of Sinclair's fatal shooting. [114] pg. 2. Similarly, other local or state public officials could have obtained the information and leaked it to the paper.

Regardless, the evidence in the record amounts to nothing more than speculation that it was either Officer Welch or Officer Reaves who leaked the information—especially given their unequivocal denials. As Burroughs cannot meaningfully link the Defendants to the newspaper reports, Burroughs cannot establish a Fourteenth Amendment violation. Further, the record contains evidence that the grand jury did not consider the polygraph results, and instead considered other evidence in reaching its decision to indict. And Burroughs has provided no facts to indicate otherwise. The Defendants are entitled to qualified immunity on the stigma-plus infringement claim.

**B. Fourth Amendment Unlawful Arrest Claim Against Officer Reaves**

In his Complaint, Burroughs stated he was asserting all claims against all Defendants. But Burroughs' counsel clarified, in the summary judgement briefing and at the February 11, 2021 hearing, that his Fourth Amendment false arrest claim is only against Officer Reaves. [110] pg. 31; Hearing Tr., 30: 13-18. Burroughs claims he suffered an unlawful arrest in violation of the Fourth Amendment when he was placed in a cell on the night of the shooting (i.e., the 86-hour detention). According to Burroughs, Officer Reaves "did not have reasonable suspicion and/or probable cause to seize and confine [him] for 86 hours." [16] pf. 12 ¶ 69. He argues that the "only 'evidence' against [him at that time] was the allegedly failed polygraph examination." [16] pg. 5 ¶ 28. According to Burroughs, Officer Reaves "utilized an inadmissible and illegitimate polygraph examination in determining probable cause[,] [and] [t]he polygraph apparently served as the basis for Mr. Burroughs' incarceration." [16] pg. 9 ¶ 49.

"The Fourth Amendment requires that probable cause exist before the government may arrest an individual." *Harris v. Payne*, 254 F. App'x 410, 415 (5th Cir. 2007) (citing U.S. Const. amend. IV). But the Constitution does not insist upon an arrest warrant. *Jones v. Lowndes Cty., Miss.*, 678 F.3d 344, 348 (5th Cir. 2012) ("[A] warrantless arrest supported by probable cause is constitutionally permissible."). Moreover, "[a]n officer's entitlement to qualified immunity based on probable cause is difficult for a plaintiff to disturb." *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 753 (5th Cir. 2001). In cases of warrantless arrest, the Court asks whether "at the time of the arrest, [the officer] had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime." *Zimmerman v. Cutler*, 657 F. App'x 340, 344 (5th Cir. 2016) (internal citations omitted). Importantly, an officer who

13

"reasonably but *mistakenly* conclude[s] that probable cause is present [is] entitled to immunity." *Id.* (emphasis in original). Put another way, "if an officer has *arguable* probable cause to arrest, he is entitled to qualified immunity." *Gliatta v. Jones*, 96 F. App'x 249, 252 (5th Cir. 2004) (emphasis in original) (citing *Brown v. Lyford,* 243 F.3d 185, 190 (5th Cir. 2001)).

Burroughs undisputedly failed the polygraph examination administered prior to his confinement. And "[p]olygraph examination results may be considered for determining probable cause." *Gliatta*, 96 F. App'x at 254 (citing *Bennett v. City of Grand Prairie,* 883 F.2d 400, 405–06 (5th Cir. 1989)). In the context of qualified immunity, "answers to the polygraph examination [may help] support the requisite *arguable* probable cause to arrest." *Id.* at 254 (emphasis added). Burroughs alleges facts to suggest that Defendant *Welch* conducted an improper polygraph examination—but those assertions are not relevant to his false arrest claim, which is only asserted against Defendant *Reaves*. Further, "the deficiency of any one piece of evidence used to demonstrate probable cause does not, on its own, mean that probable cause did not exist." *Crostley v. Lamar Cty., Texas*, 717 F.3d 410, 423 (5th Cir. 2013) (finding qualified immunity even though the warrant was of "dubious quality").

"In dealing with probable cause, [] as the very name implies, [the law] deal[s] with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Adams v. Williams*, 407 U.S. 143, 149, 92 S. Ct. 1921, 1925, 32 L. Ed. 2d 612 (1972) (internal citations omitted). Under Fifth Circuit precedent, courts "determine whether an officer was objectively unreasonable after taking into account the totality of the circumstances at the time the arrests were made." *Crostley*, 717 F.3d at 423. Here, as in *Crostley*, "there was enough evidence suggesting [Burroughs'] culpability that

14

we cannot say [Defendant Reaves] w[as] objectively unreasonable in concluding there was probable cause for [his] arrest." *Id.*; *see Brown v. Sudduth*, 675 F.3d 472, 480–81 (5th Cir. 2012) (finding "substantial basis" to arrest suspect for murder based on similarly tangential facts known to officers before the arrest, including suspect's relationship to the victim and facts indicating he had plans with the victim around the time of her death).

Burroughs incorrectly asserts that the failed polygraph test was the only piece of evidence supporting probable cause in the early morning hours of June 2, 2017. While the record does not make clear *everything* the officers knew when they initially detained Burroughs, the undisputed facts reveal that the officers had other evidence supporting probable cause at that time. For example, Sinclair was found semi-nude (wearing no clothes from the waist down), with a gunshot wound to the head, sitting in the driver's seat of her vehicle, in Burroughs' garage. Burroughs admitted he was present for the shooting. Sinclair's car also had marks on the trunk, which could indicate that the garage door was closed on her car. Burroughs told police that Sinclair's car was in reverse and in gear when she shot herself, but the immediately available evidence did not necessarily align with his version of events. In fact, the grand jury found the conflicting evidence so compelling that the foreman listed the information concerning the car as one of the bases for indicting Burroughs a few months later.

The Defendants argue that the "independent-intermediary doctrine" applies to Burroughs' Fourth Amendment false arrest claim because Burroughs was eventually indicted for manslaughter by a grand jury. Under the independent-intermediary rule, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation" for the false arrest. *Winfrey v. Rogers*,

901 F.3d 483, 496–97 (5th Cir. 2018) (internal quotations omitted). This chain of causation (between the officer's conduct and the unlawful arrest) "is broken only where *all the facts* are presented to the grand jury, or other independent intermediary where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information from the independent intermediary." *Id.* (emphasis added by Fifth Circuit) (internal quotations omitted). Because the Court finds that Officer Reaves had arguable probable cause to arrest Burroughs on June 2,[4] the applicability of the intermediary rule need not be analyzed.

Although Burroughs suggests that District Attorney Buckley effectively conceded there was no probable cause to detain Burroughs during the 86-hour confinement, the District Attorney's sworn testimony does not demonstrate such an admission. [110-10] pg. 5. The Court will not speculate as to the District Attorney's exact motivation for releasing Burroughs, but his testimony does not indicate that the officers lacked probable cause to detain Burroughs on the night of the shooting. Accordingly, Officer Reaves is entitled to qualified immunity on the false arrest claim.

## C. Fourth Amendment Claim Against Officer Reaves Concerning "Prompt" Judicial Determination

"The Supreme Court reaffirmed in *Gerstein v. Pugh* that a warrantless arrest supported by probable cause is constitutionally permissible," but it also made clear that "[t]o *continue* to detain the suspect, the state must obtain 'a fair and reliable determination of probable cause' by a neutral

---

[4] Since Burroughs was released without an "initial appearance" to determine probable cause, it is unclear what the charge(s) against him would have been on the morning of June 2. Moreover, neither Plaintiff nor Defendants provide any briefing on the probable cause issue as it relates to the exact nature of the criminal charge. Because the record indicates that Sinclair was still alive when Burroughs first went to the station on June 1, the Court finds that arguable probable cause existed for attempted murder up until her death and for murder and manslaughter afterward. *See* Miss. Code Ann. § 97-1-7; Miss. Code. Ann § 97-3-19; Miss. Code. Ann. § 97-3-47.

magistrate '*promptly* after arrest.'" *Jones v. Lowndes Cty., Miss.*, 678 F.3d 344, 348 (5th Cir. 2012) (emphases added) (quoting *Gerstein v. Pugh*, , 125, 95 S. Ct. 854, 869, 43 L. Ed. 2d 54 (1975)). As explained in *Gerstein*, "Once the suspect is in custody . . . the reasons that justify dispensing with the magistrate's neutral judgment evaporate. There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate." *Gerstein*, 420 U.S. at 114. On the other hand, "the suspect's need for a neutral determination of probable cause increases significantly" because "[t]he consequences of prolonged detention may be more serious than the interference occasioned by arrest." *Id.* For example, "[p]retrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Id.* The Supreme Court held,

> When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty. Accordingly, . . . the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.

*Id.*

Accordingly, a suspect's Fourth Amendment right to be free from unlawful arrest (i.e., detention without probable case) is separable from his Fourth Amendment right to receive a prompt, judicial determination of probable cause (i.e., to be given access to a neutral judge once detained). *See Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 53, 111 S. Ct. 1661, 1668, 114 L. Ed. 2d 49 (1991) ("Under *Gerstein,* warrantless arrests are permitted but persons arrested without a warrant must promptly be brought before a neutral magistrate for a *judicial determination* of probable cause.") (emphasis added). Generally, the Supreme Court's promptness requirement is met when "a jurisdiction [] provides judicial determinations of probable cause within 48 hours of

arrest." *Jones*, 678 F.3d at 348 (quoting *McLaughlin*, 500 U.S. at 56). That said, it is possible for a plaintiff to prevail on his constitutional claim of unreasonable delay even if the delay is less than 48 hours. *Id.* (observing that a delay could be unreasonable within 48 hours if it were "for the purpose of gathering additional evidence to justify the arrest, . . . motivated by ill will against the arrested individual, or delay for delay's sake") (internal quotations and citation omitted). Conversely, it is possible for law enforcement to prevail even if the delay *exceeds* 48 hours. *Id.* This is because the standard "accepts that police must 'cope with the everyday problems of processing suspects through an overly burdened criminal justice system,' including 'delays in transporting arrested persons,' 'handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of the arrest, and other practical realities.'" *Id.* at 349 (quoting *McLaughlin*, 500 U.S. at 57).

In short, while 48 hours is not definitive, it is "a significant marker." *Id.* In fact, it is so significant that when "the determination of probable cause is delayed by more than 48 hours[,] the burden shifts from the plaintiff to the government" to prove reasonableness. *Id.* at 349 (citing *McLaughlin*, 500 U.S. at 57). The government's showing of reasonableness "demand[s] 'a bona fide emergency or other extraordinary circumstance,'" and an "intervening weekend" is not an excuse. *Id.* (quoting *McLaughlin*, 500 U.S. at 57). It is undisputed that Burroughs was detained for more than 48 hours without a probable cause determination by a neutral judge. The government, therefore, has the burden of proving reasonableness by showing that an emergency or extraordinary circumstance existed to justify detaining him without providing access to a neutral judge.

The Defendants offer conflicting and unpersuasive arguments to support this burden of demonstrating extraordinary circumstance. They assert that "[c]ourts were not open during the weekend, so a judge was unavailable until Monday morning," but well-established Supreme Court precedent holds that "intervening weekends" cannot demonstrate "the existence of a bona fide emergency or other extraordinary circumstance." *McLaughlin*, 500 U.S. at 58–59; *see e.g.*, *Cherrington v. Skeeter*, 344 F.3d 631, 643–44 (6th Cir. 2003) ("[The Supreme Court] . . . expressly cautions that intervening weekends and holidays do not . . . permit relief from the 48–hour requirement[;] . . . [therefore,] Defendants have failed to identify any emergency or other extraordinary circumstance that might take this case outside of the general rule."). Moreover, the factual basis for Defendants' excuse is questionable, given that Officer Reaves did access a judge during Burroughs' confinement to secure search warrants. [110-3].

Defendants' effort to use an exception to Mississippi's 2017 "initial appearance" rule fails to save this argument. In 2017, the rule provided:

> Every person in custody shall be taken, **without unnecessary delay** and **within 48 hours of arrest**, before a judicial officer or other person authorized by statute for an initial appearance. . . . If the arrest has been made without a warrant, the judicial officer shall determine whether there was probable cause for the arrest and note the probable cause determination for the record. If there was no probable cause for the warrantless arrest, the defendant shall be released. . . .

Miss. Unif. Cir. & County Ct. R. 6.03 (emphasis added);[5] *see Abram v. State*, 606 So. 2d 1015, 1029 (Miss. 1992) (reversing and finding the defendant's rights were violated where the suspect was detained without a warrant from a Thursday afternoon until a Sunday afternoon because "a judge

---

[5] "Rule 6.03 became effective May 1, 1995, approximately four years after *McLaughlin,* and reflects the ruling in that case. Thus, it is an adoption of the Supreme Court's rule, despite the use of the term 'unnecessary' rather than 'unreasonable.' *Swinney v. State*, 829 So. 2d 1225, 1231 (Miss. 2002).

was available at all times"), overruled on other grounds by *Foster v. State*, 961 So. 2d 670 (Miss. 2007). It is "imperative" that the initial appearance be given "without unnecessary delay," which "means as soon as 'custody, booking, administrative and security needs have been met.' " *Id.* Once these needs have been met, "there is but one possible excuse for delay: lack of access to a judge." *Id.* This exception to the 2017 initial appearance rule cannot prove reasonableness. There is no evidence before the Court indicating that anyone attempted to access a judge—with the intent of obtaining a probable cause determination—from the time Burroughs was confined in the early, Friday morning hours until he was released on Monday afternoon. Accordingly, the Defendants' claim that Officer Reaves lacked access to a judge is wholly unsupported, and it is even potentially refuted by the fact that police obtained search warrants during this time.

Defendants also argue that "the judge who would have held the hearing was Judge Kyle Robertson," and that he "would have been unable to preside over a hearing as he was a witness in the investigation." [104] pg. 26. Judge Robertson, who was Burroughs' close friend and Sinclair's uncle, may not have been able to serve as a neutral magistrate to determine probable cause. This could potentially explain the initial delay in accessing a judge on the morning of Friday, June 2. *See Jones*, 678 F.3d at 349 (indicating reasonableness may be found when police are "handling late-night bookings where no magistrate is readily available"). But this fails to explain why Defendant Reaves did not try to get Burroughs before a neutral judge at any point during his nearly four-day confinement. If Officer Reaves knew that Judge Robertson would have to recuse himself, then another judge would have to be contacted. And it is undisputed that police secured search warrants while Burroughs was detained. Yet there are no facts before the Court to suggest that police

attempted to contact *any* judge with the purpose of obtaining a judicial determination of probable cause.

The Court is similarly unpersuaded by Defendants' argument that Officer Reaves cannot be held liable because District Attorney Buckley (as opposed to Reaves) made the decision to hold Burroughs longer than 48 hours. First, the record indicates that District Attorney Buckley gave an opinion about continuing to hold Burroughs, not that he gave the police a directive to do so. The District Attorney testified, "I think I was asked, 'Can we continue to hold him for investigative purposes?' . . . And I would have said at that point with what I knew, "Yes you can hold him. . . . I would have said yes, you can, *based on the information I had*." [103-2] pg. 4 (emphasis added). At the criminal trial, the District Attorney specifically acknowledged that it was "Sergeant Reaves" who "detain[ed] Greg Burroughs for investigative detention." [110-3] pg. 1024. Second, the Defendants offer no caselaw indicating that a police officer is absolved of all liability for this type of constitutional violation simply because he sought a prosecutor's opinion. In June 2017, the Supreme Court (*McLaughlin*) and the applicable local rules (Miss. Unif. Cir. & County Ct. R. 6.03) unequivocally required that a person in custody receive a prompt, judicial determination of probable cause. And the federal and local benchmark for unreasonable delay was 48 hours. The Court, therefore, cannot say that it was *per se* reasonable for Officer Reaves, who was the lead investigator at the time, to hold Burroughs for more than 48 hours simply because he talked to the District Attorney.

Finally, the explanations for Burroughs' continued detention do not constitute an emergency or extraordinary circumstance. In his closing argument at Burroughs' criminal trial, the District Attorney asserted—contrary to Supreme Court precedent—that Officer Reaves was

allowed by law to hold Burroughs over the weekend. [110-3] pg. 1025. He then explained that Reaves was able to use this time to get search warrants and look for more evidence at Burroughs' house. [110-3] pg. 1026. Notably, the District Attorney's statement that the police could continue to hold Burroughs while "gathering information and the search warrants for the search of the house" is *per se* unreasonable. *McLaughlin*, 500 U.S. at 56 ("Examples of unreasonable delay [include] delays for the purpose of gathering additional evidence to justify the arrest."). The District Attorney's deposition testimony that he was concerned about destruction of evidence falls short as well. The facts reveal that Burroughs' family either already had cleaned, or were in the process of cleaning, the house and garage. And Burroughs has asserted, without dispute, that the police are the ones who authorized the cleanup. At the very least, there is a factual question for the jury to determine as to whether an emergency or extraordinary circumstance could justify the prolonged detention.

Burroughs has alleged, and put forward facts demonstrating, a violation of a clearly established constitutional right, which is the failure to provide a *prompt* probable cause determination before a neutral judge. [16] pgs. 4-6, 12-14; *Gerstein v. Pugh*, 420 U.S. at 114, 125. There is a question of fact as to whether Officer Reaves' conduct was objectively reasonable, given the federal and local 48-hour benchmark for delay, the lack of evidence that Reaves sought (or even intended to seek) a judicial determination of probable cause during Burroughs' 86-hour detention, and the question regarding extraordinary circumstances. Based on the facts currently before it, the Court cannot find that Officer Reaves' conduct pertaining to *this* claim was objectively reasonable as a matter of law. *Id.* But a jury may ultimately find in favor of Officer Reaves. Officer Reaves is not entitled to summary judgment on this one claim.

**D.  Other Fourteenth Amendment Claims asserted against the Officers**

Burroughs asserts that Officers Reaves and Welch fabricated and mispresented evidence in violation of the Fourteenth Amendment, but Burroughs fails to support this claim with facts or analogous caselaw. Burroughs cites to *Good v. Curtis*, where the Fifth Circuit affirmed denial of summary judgment because "a concerted effort on the part of a police officer to 'frame' a suspect by manipulating a photo for a photo lineup to produce a false identification from an eyewitness constitutes a violation of the due process rights secured by the Fourteenth Amendment." *Good v. Curtis*, 601 F.3d 393, 399 (5th Cir. 2010). He also cites to *Geter v. Fortenberry*, where the Fifth Circuit explained that "a police officer cannot avail himself of a qualified immunity defense if he procures false identification by unlawful means or deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles." *Geter v. Fortenberry*, 849 F.2d 1550 (5th Cir. 1988) (*Geter I*)). In *Geter*, plaintiffs overcame the qualified immunity defense but only after "set[ting] forth a wealth of specifics and confirming factual details" to support allegations that the defendant officer obtained false and fraudulent identifications; concealed exculpatory evidence; and gave false information to county prosecutors. *Geter v. Fortenberry*, 882 F.2d 167 (5th Cir. 1989) (*Geter II*).

Burroughs' reliance on *Good* and *Geter* is misplaced. In these cases, the Fifth Circuit found clearly established constitutional rights based on a body of caselaw concerning false identifications, deliberately concealed or fabricated evidence, and false information provided to prosecutors. In the present case, there is no allegation of a false identification, and the existing allegations do not support a claim that Officer Reaves or Officer Welch deliberately concealed exculpatory evidence or lied to the District Attorney about the investigation. Rather, Burroughs alleges facts indicating

23

that the officers may have made mistakes or errors in their investigation. Namely, Burroughs claims that Officer Reaves did not adequately test the gun from Sinclair's shooting, and that Officer Welch performed a flawed polygraph with only a probationary license.

The facts show that Officer Reaves did test the gun—he simply did not test it to Burroughs' satisfaction. The criminal trial testimony reveals that Reaves submitted the gun for ballistics testing, and he submitted two latent fingerprint lifts from the gun to the Mississippi Crime Lab. According to his sworn testimony, Reaves did not test the *exterior* of the gun for fingerprints because—based on his twenty-two years of experience as police officer—the frame made of polymer dimple and the slide made of parkerized metal were not conducive to fingerprinting. As for Burroughs' allegation that Reaves did not test the gun for blowback evidence, the medical examiner, Lisa Funte, testified that having knowledge of blowback being present would not change her opinion as to the manner of Sinclair's death, which she opined to be "undetermined." [110-3] pg. 222. The medical examiner's testimony makes clear that this evidence was not exculpatory, as it would not have changed her opinion from undetermined to suicide. Burroughs provides no caselaw concerning similar facts, and the record does not indicate that any of the evidence mentioned is blatantly exculpatory.

Regarding Officer Welch, Burroughs claims that the polygraph examination should not have been administered under the circumstances, and that Officer Welch should have had a *license* to administer polygraph examinations, as opposed to a *certificate*. [110] pg. 16. Burroughs asserts the examination may have turned out differently if the polygraph had been handled without these, and certain other, alleged deficiencies. Even if Burroughs could show that the polygraph examination was not handled appropriately, Burroughs can point to no authority that supports a

constitutional violation for how this particular polygraph examination was administered. There is no evidence before the Court showing that Welch conducted an "illegitimate" polygraph with the intent of producing an inaccurate result. The Court acknowledges that there are conflicting expert opinions in the record regarding the polygraph,[6] but the differences in opinion do not overcome Officer Welch's "good-faith assertion of qualified immunity," which requires that Burroughs' "version of [] disputed facts . . . constitute a violation of clearly established law." *Joseph on behalf of Est. of Joseph*, 981 F.3d at 330.

The allegations against Officers Reaves and Welch clearly do not rise to the level of the officers' actions in *Good* and *Geter*, and it is well established that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Winfrey v. San Jacinto Cty.*, 481 F. App'x 969, 975 (5th Cir. 2012) (internal citations omitted). Significantly, Burroughs is unable to "identify a [single] case"—much less a "body of relevant case law"—where "an officer acting under similar circumstances [to Officers Reaves and Welch] . . . was held to have violated the [Constitution]." *Joseph on behalf of Est. of Joseph*, 981 F.3d at 330. The undisputed facts, when viewed in the light most favorable to Burroughs, simply do not indicate a constitutional violation.

Finally, there is no merit in Burroughs' assertion that the actions (or inactions) of Officers Reaves and Welch caused Burroughs to be wrongfully charged in connection with Sinclair's death and indicted for manslaughter. As discussed, Officer Reaves had arguable probable cause to arrest

---

[6] Burroughs' pending Motion to Strike [115] asks this Court to strike certain testimony of David Clayton—who was Defendant Welch's polygraph intern sponsor—because he is no longer designated as an expert. Specifically, Burroughs points to references to Clayton's testimony in Defendants' Reply Brief in support of summary judgment. The Court finds that all expert opinions concerning Welch's administration of the polygraph are unnecessary to the Court's present ruling on summary judgement.

Burroughs following the shooting. *See Poole v. City of Killeen*, 999 F.2d 1580 (5th Cir. 1993) ("This court has specifically held that regardless of whether individuals arrested are eventually acquitted of the charges against them, probable cause for the arrest gives rise to a qualified immunity defense to a § 1983 claim against the officer."). And the affidavit of District Attorney Buckley makes clear that, by the time of the indictment, more than sufficient evidence of probable cause existed. [103-1].

### E. Section 1983 Policy, Supervision, and Training Claims against the City

The City of Laurel cannot be liable under Section 1983 on the theory of *respondeat superior*. *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "A municipality is liable only for acts directly attributable to it through some official action or imprimatur." *Valle*, 613 F.3d at 536 (internal citations omitted). The Fifth Circuit has "stated time and time again that '[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing.'" *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866–67 (5th Cir. 2012) (citing *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 120, 112 S. Ct. 1061, 117 L.Ed.2d 261 (1992)). To establish liability against the City, Burroughs "must show the deprivation of a federally protected right caused by action taken "pursuant to an official municipal policy." *Id.* Pursuant to Fifth Circuit and Supreme Court precedent, "municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell,* 436 U.S. at 694).

To prove the third element, Burroughs must show that the City acted with "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision," and he "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Valle*, 613 F.3d at 542 (quoting *Bd. of the County Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L.Ed.2d 626 (1997)). Deliberate indifference is "a stringent standard" that requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty.,* 520 U.S. at 410. "[E]ven *heightened* negligence" is not enough to reach this degree of culpability. *Valle*, 613 F.3d at 542 (internal citations omitted) (emphasis added). Regarding Burroughs' failure-to-supervise/train claims against the City, a local government's decision *not* to train is actionable under 1983 only "in limited circumstances," and "[a] municipality's culpability for a deprivation of rights is at its *most tenuous* where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 (emphasis added).

Burroughs argues that the City is liable under Section 1983 based on (1) a lack of policies or procedures for polygraph evidence and (2) unenforced policy and procedures pertaining to leaking information to the press. As discussed in the qualified immunity analysis, Burroughs has failed to put forward facts showing he was harmed by a clearly established constitutional violation concerning the polygraph or any alleged leaks to the press. Moreover, the undisputed facts do not reveal an "unconstitutional official policy" or "a facially innocuous policy promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (internal citations omitted).

Burroughs' Section 1983 claims against the City fail, and the City is entitled to summary judgement.

### IV.    STATE LAW CLAIMS

During a February 11, 2021 hearing in this matter, Burroughs' counsel confirmed what seemed apparent from the summary judgment briefing: Burroughs has voluntarily abandoned his state law claims against the Defendants. *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 525 (5th Cir. 2005) (finding it "clear" that the party had abandoned the non-adjudicated claims where that party had acknowledged to the district court that he intended to abandon certain claims). Accordingly, the Court will not rule on these claims. *Vaughn v. Mobil Oil Expl. & Producing Se., Inc.*, 891 F.2d 1195, 1198 (5th Cir. 1990) ("Ample authority exists that trial courts will not rule on claims—buried in pleadings—that go unpressed before the court.").

### V.    CONCLUSION

Regarding all 42 U.S.C. § 1983 claims, the Court finds that Defendant Welch is entitled to qualified immunity, and that there is no municipal liability for Defendant City of Laurel. Regarding the 42 U.S.C. § 1983 claims against Defendant Reaves, the Court finds that Defendant Reaves is entitled to qualified immunity, except for Burroughs' claim concerning the promptness requirement for a determination of probable cause before a neutral judge. The Court also finds that Burroughs' remaining state law claims are abandoned.

Summary judgment is granted as to Officer Welch and the City of Laurel. Summary judgment is granted in part, and denied in part, as to Officer Reaves. For the foregoing reasons, Defendants' Motion for Summary Judgment [103] is GRANTED in part and DENIED in part.

The Court also finds that Defendants' pending Motion to Exclude [105] and Plaintiff's pending Motion to Strike [115] are MOOT.[7]

It is so ordered, this the 30th day of April, 2021.

_____
TAYLOR B. McNEEL
UNITED STATES DISTRICT JUDGE

[7] Both motions concern the testimony of Burroughs' polygraph experts, which is not necessary to the Court's summary judgement analysis and ruling. For purposes of clarity, Defendants' request for costs and attorneys' fees is denied, as Defendants did not demonstrate an entitlement to the request.